# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LEONARD CESSNA,** *on behalf of himself and all others similarly situated,* **and GEORGE WORK,** *on behalf of himself and all others similarly situated,* | ) ) ) ) | **Case No. 3:16-cv-42** |
| | ) | **JUDGE KIM R. GIBSON** |
| **Plaintiffs,** | ) ) ) | |
| **v.** | ) ) | |
| **REA ENERGY COOPERATIVE, INC.,** | ) ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

On December 31, 2015, Leonard Cessna and George Work filed this case in the Court of Common Pleas of Blair County against REA Energy Cooperative, Inc. REA is an electric cooperative of which Cessna and Work ("Plaintiffs") are current and former members, respectively—meaning REA is and was their electricity supplier. Plaintiffs seek to represent a class of REA members. They allege that REA is improperly withholding revenues in excess of its operating costs and that REA is legally obligated to disgorge these excess revenues to its members. REA removed the case to this Court on February 11, 2016.

Pending before the Court is REA's motion to dismiss (ECF No. 10) and Plaintiffs' motion to strike REA's motion to dismiss (ECF No. 35). For the reasons that follow, REA's motion to dismiss will be granted and Plaintiffs' motion to strike will be denied.

## I.    Background[1]

The following facts are alleged in the complaint (ECF No. 1-1).  The Court accepts these factual allegations as true in deciding REA's motion to dismiss, but "[w]here those allegations are contradicted by written exhibits that [Plaintiffs] attached to [their] . . . complaint, . . . the exhibits trump the allegations." *Abcarian v. McDonald*, 617 F.3d 931, 933 (7th Cir. 2010).

REA is a domestic non-profit corporation that provides residential and business electrical service to its 22,000 members in Armstrong, Blair, Cambria, Clearfield, Indiana, Jefferson, and Westmoreland Counties, Pennsylvania.  (ECF No. 1-1 ¶ 3.)  REA is a so-called rural electric cooperative, meaning it is a member-owned entity rather than a publicly traded corporation with freely alienable stock.  (*Id.* ¶ 6.)  Leonard Cessna resides in Indiana County, Pennsylvania, and has been a member of REA for approximately 30 years.  (*Id.* ¶ 1.)  George Work resides in Jefferson County, Pennsylvania, and was a member of REA for approximately 50 years before he withdrew from membership in 2011.  (*Id.* ¶ 2.)  Thus, Cessna has been purchasing and continues to purchase his electricity from REA and Work used to do so.  (*Id.* ¶¶ 1-2.)

Plaintiffs contend that REA is improperly withholding funds that belong to its members.  They contend that REA, as a cooperative, is prohibited from making a profit on business conducted with its members.  (*Id.* ¶ 9.)  Cessna and Work explain that "[c]operative principles require that members provide capital for the cooperative's use in proportion to their use of the cooperative," and state that this principle is referred to as the "user-owner principle".  (*Id.* ¶ 15.)

---

[1] The Court provided a detailed account of this case's procedural and factual background in its memorandum opinion dated July 21, 2016 (ECF No. 24).  Because familiarity with that opinion is assumed, the facts relevant to REA's motion to dismiss only will be outlined here.

The difference between REA's revenues and expenses is therefore considered "margin"—not profit—and this margin belongs to REA's members in the form of patronage capital. (*Id.* ¶¶ 9-10.)

The amount of patronage capital that each member earns annually is based on the member's electric usage, and patronage capital is allocated to each member in a separate account on REA's books. (*Id.* ¶ 5.) These accounts reflect a credit or debit for each year the member was or continues to be a member. (*Id.* ¶ 17.) The members own an interest in REA worth over $53,000,000—as of 2014—represented in the form of this patronage capital. (*Id.* ¶ 6.) Cessna and Work allege that, because members cannot sell or redeem their interest in REA like stockholders in a publicly traded corporation can, they are "at the mercy of [REA] when it comes to receiving a financial distribution of their accumulated Patronage Capital." (*Id.*)

According to REA's bylaws, its articles of incorporation and bylaws constitute a contract between REA and each member. (*Id.* ¶ 11.) Cessna and Work allege that REA does not provide its members with a copy of its articles of incorporation. (*Id.* ¶ 12.) REA's bylaws require that it operate on a cooperative non-profit basis for the mutual benefit of its members. (*Id.* ¶ 14.) Article VIII of REA's bylaws provides that REA is obligated to account on a patronage basis to its members for all amounts received and receivable from members in connection with REA's services. (*Id.* ¶ 13.) Article VIII provides further that REA receives all amounts in excess of operating costs and expenses "with the understanding that they are furnished by the [members] as capital." (*Id.* ¶¶ 13, 16 (capitalized in original).) Patronage-capital accounts are non-transferrable, cannot appreciate in value, and do not accrue interest. (*Id.* ¶ 24.) REA's bylaws also provide a mechanism for the return of patronage capital:

> In the event of the dissolution or liquidation of the Cooperative, after all outstanding indebtedness of the Cooperative shall have been paid, outstanding capital credits shall be returned without priority on a prorata basis before any payments are made on account or property rights of patrons. <u>If, at any time prior to dissolution or liquidation, the Board of Directors shall determine that the financial condition of the Cooperative shall not be impaired thereby, the capital then credited to patrons' accounts may be returned in full or in part.</u>

(*Id.* ¶ 13 (quoting REA's bylaws, Article VIII).)

Plaintiffs assert that, as a result of inflation and the time value of money, the value of patronage capital decreases the longer REA retains it before returning it to its members. (*Id.* ¶ 24.) And Plaintiffs believe that REA is earning interest on its members' patronage capital and not allocating that interest back to them. (*Id.* ¶ 25.) In 2011, REA retired patronage capital for the first time since its inception in 1937, though this refund applied only to members who obtained electricity from REA before 1961. (*Id.* ¶ 26.) Plaintiffs assert that REA's retention of the patronage capital increases the likelihood that it will be unable to locate the members, and that this will result in the eventual escheat of the unclaimed capital to REA. (*Id.* ¶ 27.)

Plaintiffs believe and allege the following: (1) that the patronage capital is worth approximately $56,000,000 today; (2) that in 2011 REA retired approximately $700,000 of patronage capital for the years prior to 1961; (3) that REA has not made an appropriate patronage-capital distribution prior to or since 2011; (4) that REA has not made an appropriate attempt to locate the approximately 6,000 members who failed to redeem their patronage-capital retirement checks in 2011; (5) that REA is poised to retain a large percentage of the patronage capital for the years prior to 1961; (6) that REA has acted unethically and breached its fiduciary duties by failing to locate the members to whom it wrongly denied patronage-capital

retirement checks for the past fifty years or longer; (7) that REA should not be permitted to claim that the members are unreachable because it has improperly withheld the patronage-capital retirement checks for over fifty years and has failed to take reasonable steps to locate members; and (8) that REA's failure to adopt a reasonable, workable, and equitable system for returning patronage capital to its members is an abdication of its duty to the members, an abuse of discretion, and a breach of its fiduciary duties. (*Id.* ¶¶ 28-36.)

Plaintiffs therefore seek to represent a class of current and former members in this suit against REA. Plaintiffs assert six claims. In Count I, Plaintiffs assert a claim under Pennsylvania's Unfair Trade Practices and Consumer Protection Law. (*Id.* ¶¶ 44-58.) In Counts II and III, Plaintiffs assert claims for breach of the covenant of good faith and fair dealing and for breach of contract. (*Id.* ¶¶ 57-70.)[2] In Count IV, Plaintiffs assert, in the alternative, a claim for unjust enrichment. (*Id.* ¶¶ 71-78.) In Count V, Plaintiffs seek declaratory and injunctive relief. (*Id.* ¶¶ 79-87.) And in Count VI, Plaintiffs assert a claim for breach of fiduciary duty of an agent or trustee. (*Id.* ¶¶ 88-92.) Plaintiffs also point to § 7330 of Pennsylvania's Electric Cooperative Law of 1990 (15 Pa. Cons. Stat. § 7330), and argue that if REA's bylaws give its board of directors absolute discretion over the disbursement of patronage capital, then such discretion would violate § 7330. (ECF No. 1-1 ¶ 19-20.)

On February 18, 2016, REA filed a motion to dismiss Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(6) (ECF No. 10). REA's motion to dismiss prompted both a motion to stay (ECF No. 12) and a motion to remand (ECF No. 14) by Plaintiffs. Only once

---

[2] Count II of Plaintiffs' complaint, which should begin as paragraph 59, begins as paragraph 57. (*See id.* ¶¶ 58-64.)

those motions were resolved—and denied—did Plaintiffs file a response to REA's motion to dismiss.  In their response, Plaintiffs also moved to strike—rather than simply oppose—REA's motion to dismiss.  And Plaintiffs and REA thereafter both moved and were granted leave to file multiple supplemental briefs.  REA's motion to dismiss and Plaintiffs' related motion to strike are now ripe for adjudication.

## II.    Standard of Review

In determining the sufficiency of a complaint challenged under Rule 12(b)(6), a district court must conduct a two-part analysis.  First, the court should separate the factual and legal elements of the claims.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).  Second, the court must determine whether the factual matters alleged are sufficient to establish that the plaintiff has a "plausible claim for relief."  *Id.* at 211 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).  The complaint, however, need not include "detailed factual allegations."  *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

The court must also accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to the nonmoving party.  *See id.* at 228 (citing *Worldcom, Inc. v. Graphnet, Inc.*, 343 F.3d 651, 653 (3d Cir. 2003)).  But "legal conclusions" and "[t]hreadbare recitals of the elements of a cause of action . . . do not suffice."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).  Rather, the complaint must present sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 262 n.27 (3d Cir .2010) (quoting *Iqbal*, 556 U.S. at 678).

Ultimately, whether a plaintiff has stated a "plausible claim for relief" is a context-specific inquiry that requires the district court to "draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (citation omitted). The record to consider in making this determination includes the complaint and any "document integral or explicitly relied on in the complaint." *U.S. Express Lines, Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002) (emphasis and citation omitted).

## III. Analysis

REA has moved to dismiss Plaintiffs' complaint on several grounds. The Court will first address REA's threshold argument, which is that Plaintiffs' claims are preempted by the Supremacy Clause of the United States Constitution. Next, because the Court holds that Plaintiffs' claims are not barred by the Supremacy Clause, it will address REA's arguments with respect to each of Plaintiffs' claims.

Federal courts, when presented with state-law claims, "are required to apply the substantive law of the state whose laws govern the action." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 378 (3d Cir. 1990) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). Because all of Plaintiffs' claims arise under state law, the Court applies Pennsylvania law in evaluating whether they are actionable.

### A. Supremacy Clause

REA asserts that Plaintiffs' claims fail because they are preempted by the Supremacy Clause of the United States Constitution. (ECF No. 11 at 6.) Specifically, REA argues that Plaintiffs' claims are preempted to the extent they would force REA to refund patronage capital to a point where its equity would fall below 30%. Such an application of state law is preempted,

REA posits, because it would conflict with the federal Rural Electrification Act and related regulations, and would force REA to violate its contract with the United States. In support of this argument, REA points to its loan contract with the Rural Utilities Service—the federal agency tasked with administering the Act—and 7 C.F.R. § 1717.617.[3]

The Supremacy Clause of the United States Constitution provides that the laws of the United States "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Stated simply, the result of the Supremacy Clause is that "[w]here state and federal laws conflict, the state law is 'without effect.'" *Delaware County, Pa. v. Fed. Hous. Fin. Agency*, 747 F.3d 215, 225 (3d Cir. 2014) (citing *Mut. Pharm. Co., Inc. v. Bartlett*, ___ U.S. ___, 133 S. Ct. 2466, 2472-73 (2013)). The question is thus whether a given state law and a given federal law actually conflict; if they do, the state law is preempted by the federal law.

Federal preemption of state law can occur in three ways: (1) express preemption, (2) field preemption, and (3) conflict preemption. *See, e.g.*, *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992). Express preemption occurs when Congress explicitly, through statutory language, states its intent to displace state law. *Id.* Field preemption occurs when "Congress has legislated comprehensively to occupy an entire field of regulation, leaving no room for the States to supplement federal law." *Hughes v. Talen Energy Mktg., LLC*, ___ U.S. ___, 136 S. Ct.

---

[3] In making its preemption argument, REA refers to its loan contract with the Service and incorporates its notice of removal, to which REA attached four pages of that loan contract (ECF No. 1-2). But in deciding a Rule 12(b)(6) motion, a court may generally consider only the complaint, attached exhibits, and matters of public record. *Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2008). The Court is without sufficient information to conclude that REA's loan contract is a public record or otherwise a valid document to consider in deciding REA's motion to dismiss, and REA has stated no basis that would justify the Court relying on an extraneous document.

1288, 1297 (2016) (internal quotation marks and citation omitted).  As for conflict preemption, that occurs in two ways: if "it is impossible for a private party to comply with both state and federal law, [or if] under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372-73 (2000) (brackets, citations, and internal quotation marks omitted).  And it is not only federal legislation that preempts state law; "[f]ederal regulations preempt state laws in the same fashion as congressional statutes."  *Farina v. Nokia Inc.*, 625 F.3d 97, 115 (3d Cir. 2010) (citations omitted).

In their complaint, Plaintiffs allege that § 7330 of Pennsylvania's Electric Cooperative Law of 1990 (15 Pa. Cons. Stat. § 7330) obligates REA to return patronage capital to its members. (ECF No. 1-1 ¶ 19.)  Section 7330, titled nonprofit operation, governs the financial operation of Pennsylvania electric cooperatives.[4]  Section 7330(a) mandates that electric cooperatives be operated without profit to their members, and § 7330(b) restricts how electric cooperatives can use their revenues.  These must be used to first pay "operating and maintenance expenses and the principal and interest on outstanding obligations and, thereafter, to such reserves for improvement, new construction, depreciation and contingencies as the board may, from time to time, prescribe."  15 Pa. Cons. Stat. § 7330.  Revenues not required for these purposes "shall be returned, from time to time, to the members on a pro rata basis, according to the amount of business done with each during the period"—though the cooperative retains discretion on the manner by which to return revenues.  § 7330(c).

---

[4] Pennsylvania's Electric Cooperative Law of 1990 applies to corporations incorporated under specific provisions of Pennsylvania law.  *See* 15 Pa. Cons. Stat. § 7302(a).  Although Plaintiffs do not explicitly assert that REA is incorporated under those provisions, REA's bylaws provide that it is governed by Pennsylvania's Electric Cooperative Law of 1990 (ECF No. 1-1 at 36) and REA does not contest this here.

Rural electric corporations are also regulated under federal law. REA asserts that it is subject to the federal Rural Electrification Act and its related regulations, and points to 7 C.F.R. § 1717.617 specifically. Section 1717.617 sets forth the criteria under which the Rural Utilities Service will automatically approve a cooperative's patronage-capital refund request if that cooperative has a loan from the Service and is required by its loan documents to obtain approval from the Service before issuing such a refund. REA asserts that it has a loan from the Service and is thus subject to § 1717.617. One of § 1717.617's criteria for automatic approval is that the cooperative's equity, after any refund, must be equal to or greater than 30 percent of its total assets. 7 C.F.R. § 1717.617.

The Court notes that Plaintiffs do not allege sufficient facts in their complaint to establish that § 1717.617 applies to REA, as REA asserts, and that Plaintiffs make no allegations in their complaint regarding the terms of REA's loan contract with the Service. But even if the Court assumes without deciding that REA is subject to 7 C.F.R. § 1717.617, any possible conflict between that regulation and 15 Pa. Cons. Stat. § 7330 would only limit Plaintiffs' possible relief rather than preempt their claims entirely.

As an initial matter, this case does not implicate express or field preemption. As noted by the Supreme Court, "[n]othing in the Rural Electrification Act expressly pre-empts state rate regulation of power cooperatives financed by the [Rural Utilities Service]." *Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 385 (1983). Although this case does not concern state *rate* regulation of power cooperatives, that is a distinction without a difference; nothing in

the Act expressly preempts any state regulation of power cooperatives.[5] Nor does the Act implicate field preemption. Congress has not legislated so comprehensively in the field of rural electric cooperatives that there is no room for state regulation. The Act does not establish a comprehensive regulatory scheme for rural electric cooperatives; it establishes a framework for providing loans "for the purpose of furnishing and improving electric . . . service in rural areas . . . and for the purpose of assisting electric borrowers to implement demand side management, energy efficiency and conservation programs, and on-grid and off-grid renewable energy systems." 7 U.S.C. § 902(a). And its provisions leave ample room for state regulation, meaning field preemption is inapplicable here. *See Wabash Valley Power Ass'n, Inc. v. Rural Electrification Admin.*, 988 F.2d 1480, 1486 (7th Cir. 1993) ("More than fifty years of state regulation of cooperative utility rates (in those states that have continued to regulate these rates) since the enactment of the RE Act certainly reflects the fact that Congress has not occupied the field.").

This leaves conflict preemption. REA states that "Plaintiffs' claims create an obstacle to and frustrate the purpose of the Rural Electrification Act" (ECF No. 11 at 6), but does not elaborate on this point or explain what purpose would be frustrated—or how. As discussed, the Act is primarily a vehicle for providing federal loans for the purpose of establishing and improving electric service in rural areas. It is conceivable that a hypothetical state law "may so seriously compromise important federal interests, including the ability of the [cooperative] to repay its loans, as to be implicitly pre-empted by the [Act]." *Ark. Elec.*, 461 U.S. at 388 (citations

---

[5] This is not to say that the Act's regulatory scheme is devoid of express preemption. After *Arkansas Electric*, the Service established detailed regulations preempting state rate regulations of rural electric cooperatives in certain circumstances. *See* 7 C.F.R. § 1717.300 *et seq.* Those regulations, however, are not implicated here.

omitted).  But § 7330 is not that hypothetical law.  Its provisions leave cooperatives with ample room for the prudent operation of their business.  Section 7330(a)(1) instructs cooperatives to set their rates so that the cooperative is able to "pay all operating and maintenance expenses necessary or desirable for the prudent conduct of its business and the principal of and interest on the obligations issued or assumed by the corporation in the performance of the purpose for which it was organized."  And § 7330(b) gives cooperatives broad discretion to designate what revenues are required for improvements, new construction, depreciation, and contingencies— and which revenues are therefore exempt from § 7330(c)'s refund requirement.  *See* § 7330(b) ("such reserves for . . . contingencies as the board may, from time to time, prescribe").

REA's strongest conflict-preemption argument is that if § 7330(c) requires REA to reduce its equity below 30% then it would be impossible for REA to comply with both § 7330(c) and § 1717.617 and REA would have to violate its loan contract with the Service.  There are two problems with that argument.  First, § 1717.617 does not actually impose any legal obligations on REA; it merely provides criteria under which the Service *automatically* approves a cooperative's patronage-capital refund if the Service's approval is required by the cooperative's loan documents.  Thus, § 1717.617 itself does not mandate that REA's equity has to stay above 30%.  REA is just not granted automatic approval through § 1717.617 to issue a patronage refund if its equity would fall below 30% as a result.[6]

Because § 1717.617 does not impose any legal obligations on REA, the source for any such obligations that would give rise to a conflict must be found elsewhere—such as in REA's

---

[6] It is also worth noting that § 1717.617 does not establish exclusive conditions.  That is, § 1717.617 provides criteria under which the Service automatically approves a patronage refund if approval is required by the borrower's loan documents, but this does not mean the Service will disapprove requests from cooperatives to make patronage refunds in other circumstances.

loan agreement with the Service. That brings us to the second problem with REA's preemption argument. Even if REA's loan agreement imposed obligations that interfered with REA complying with state law, it is not clear that this would make a difference here. It is "federal *law* which preempts contrary state law; nothing short of federal law can have that effect." *Fellner v. Tri-Union Seafoods, L.L.C.*, 539 F.3d 237, 244 (3d Cir. 2008). A provision in a loan agreement is not federal law, even if one party is a federal agency. Although actions by federal agencies can preempt state law, federal law capable of preempting state law is not created every time an agency makes a statement or takes an action within the agency's jurisdiction. *Id.* at 245. In determining whether agency action should be afforded preemptive effect, the Third Circuit has "decline[d] to afford preemptive effect to less formal measures lacking the 'fairness and deliberation' which would suggest that Congress intended the agency's action to be a binding and exclusive application of federal law." *Id.*

The Court cannot at this stage and on this limited record determine whether provisions in REA's loan contract with the Service should be afforded preemptive weight. It thus reserves that question, and for now resolves it on a simpler ground. Assuming for the sake of argument that REA's loan agreement with the Service requires REA to maintain equity greater than or equal to 30% of its assets, and that this provision should have preemptive effect, REA's equity would have to actually fall below 30% of its assets before a conflict would arise. Based on REA's 2014 financial report, this leaves REA with approximately $21,000,000 to disgorge before

any purported conflict would arise.[7]  (*See* ECF No. 1-1 at 63.)  Thus, any possible preemption would only limit Plaintiffs' relief.  It would not preempt their claims entirely.  The Court therefore turns to the substance of Plaintiffs' claims.

**B.    Count I—Pennsylvania's Unfair Trade Practices and Consumer Protection Law**

In Count I, Plaintiffs assert a claim for violations of Pennsylvania's Unfair Trade Practices and Consumer Protection Law, or UTPCPL for short.  The UTPCPL is a Pennsylvania consumer-protection law and its "underlying foundation is fraud prevention." *Weinberg v. Sun Co.*, 777 A.2d 442, 446 (Pa. 2001) (internal quotation marks and citation omitted).  It prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." 73 Pa. Cons. Stat. § 201-3.  Section 201-2(4) defines the prohibited unfair methods of competition and unfair or deceptive acts or practices, and includes a catchall provision (subsection xii) that prohibits "any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."  The UTPCPL also creates a private right of action for persons who suffer an ascertainable loss as a result of violations of the UTPCPL.  73 Pa. Cons. Stat. § 201-9.2.

Plaintiffs assert two grounds for recovery under the UTPCPL.  First, they allege that REA has failed to comply with a written guarantee or warranty, violating § 201-2(4)(xiv).  Second, they allege that REA has engaged in other fraudulent or deceptive conduct, violating § 201-2(4)(xxi).

---

[7] The Court notes also that—as REA itself points out—§ 7330(c) calls only for revenues not required for the purposes set forth in § 7330(b) to be returned.  And § 7330(b) gives REA broad discretion to designate what revenues are "required." *See* § 7330(b) ("such reserves for . . . contingencies as the board may, from time to time, prescribe").  Thus, REA could avoid any potential conflict between a minimum-asset requirement and a refund requirement by designating an appropriate reserve in case a refund must be made.

REA offers multiple arguments for why Plaintiffs' UTPCPL claim should be dismissed. It argues that the UTPCPL is inapplicable here because Plaintiffs make only conclusory allegations about "unfair or deceptive acts or practices" and because the UTPCPL should not apply to non-profit entities. REA argues further that Plaintiffs' allegation that REA failed to comply with a written guarantee or warranty is insufficient as a matter of law because Plaintiffs fail to actually identify any written guarantee or warranty. And REA argues that Plaintiffs have not sufficiently alleged that REA engaged in fraudulent or deceptive conduct and that Plaintiffs have failed to plead justifiable reliance on REA's supposedly deceptive acts.

As a preliminary matter, the Court finds unconvincing REA's argument that the UTPCPL should not apply to non-profits. In support of this argument, REA cites only to the concurring opinion in a Pennsylvania Supreme Court case that addressed whether political-subdivision agencies are "persons" under the UTPCPL, *Meyer v. Cmty. Coll. of Beaver Cty.*, 93 A.3d 806, 816 (Pa. 2014) (Castille, C.J., concurring). In that concurrence, the author noted that the UTPCPL by its terms applies only to entities engaged in "the conduct of any trade or commerce" and opined that the defendant in that case—a county community college—was not engaged in trade or commerce because its focus was education rather than private gain. *See Meyer*, 93 A.3d at 816 (Castille, C.J., concurring).

This Court disagrees with that rationale and therefore declines to adopt it. The UTPCPL defines "trade or commerce"; § 201-2(3) provides that these terms "mean the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, and includes any trade or commerce directly or indirectly affecting the people of this

Commonwealth." That definition does not carve out an exception for trade or commerce that is motivated by a particular goal; as long as the activity involves the "advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value," then it qualifies as trade and commerce. REA might be a non-profit, but it is still engaged in the "sale or distribution of [a] service[]"—namely electrical service—and is thus engaged in trade and commerce as defined by the UTPCPL.[8] Its provisions therefore apply to REA.

Nevertheless, REA is correct that Plaintiffs have failed to state a claim for a violation of the UTPCPL. To review, Plaintiffs base their UTPCPL claim on REA's alleged failure to "comply with the terms of any written guarantee or warranty given to [Plaintiffs] at, prior to or after a contract for the purchase of goods or services is made" (violating § 201-2(4)(xiv)) and REA engaging in "other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding" (violating § 201-2(4)(xxi)). Yet their factual allegations fall short of stating an actionable UTPCPL claim.

To state a claim under § 201-2(4)(xiv), a plaintiff must as a threshold matter identify a written guarantee or warranty and its terms. *See Seldon v. Home Loan Servs.*, 647 F. Supp. 2d 451, 466 (E.D. Pa. 2009). To state a claim under the UTPCPL's catchall provision, § 201-2(4)(xxi), a plaintiff must allege a deceptive act that is likely to deceive a consumer acting reasonably under similar circumstances. *See Slapikas v. First Am. Title Ins. Co.*, 298 F.R.D. 285, 292 (W.D. Pa. 2014) (citing *Seldon*, 647 F. Supp. 2dat 470). And for both types of claims a plaintiff must allege (1)

---

[8] In addition, Pennsylvania state courts have overruled preliminary objections seeking demurrer as to UTPCPL claims against non-profits. *See, e.g., Kern v. Lehigh Valley Hosp., Inc.*, No. 2012-C-3438, 2013 WL 1845838 (Pa. C.P. Feb. 21, 2013) (overruling non-profit defendant's preliminary objection to plaintiff's UTPCPL claim).

justifiable reliance, and (2) that the plaintiff suffered ascertainable loss as a result of that reliance. *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 438 (Pa. 2004) ("To bring a private cause of action under the UTPCPL, a plaintiff must show that he justifiably relied on the defendant's wrongful conduct or representation and that he suffered harm as a result of that reliance." (citing *Weinburg v. Sun Co.*, 777 A.2d 442, 446 (Pa. 2001)); *see also Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 136 (3d Cir. 2005) ("a plaintiff bringing an action under the UTPCPL must prove . . . reliance and causation with respect to all subsections of the UTPCPL" upon which that plaintiff brings a claim (citation omitted)). Justifiable reliance in this context means more than a mere causal connection between the wrongful conduct and the harm; the plaintiff "must show that he justifiably bought the product in the first place (or engaged in some other detrimental activity) because of the misrepresentation." *Hunt v. U.S. Tobacco Co.*, 538 F.3d 217, 222 n.4 (3d Cir. 2008) (citing *Weinberg*, 777 A.2d at 446). Plaintiff's UTPCPL claim falters primarily on the justifiable-reliance element.

In Count I of their complaint, Plaintiffs state that REA "failed to comply with the written warranties, guarantees and representations regarding the return of Patronage Capital" and that REA "knew or should have known that its actions regarding its failure to properly return Patronage Capital were not as warranted, guaranteed and/or represented." (ECF No. 1-1 ¶¶ 47.a, 48.) Nowhere in that Count, however, do Plaintiffs identify specific language from a specific document, explain what document they contend is a written guarantee or warranty, or explain specifically what guarantee or warranty was violated or how. In their response to REA's motion to dismiss, Plaintiffs state that they incorporated the rest of the complaint into Count I by reference and that "[t]he written Guarantee or Warranty would be in the *Penn Lines*,

Bylaws and Articles of Incorporation."[9]  Plaintiffs go on to argue that "[t]o the extent that [REA] claims that it will return patronage capital when it is financially feasible to but, aside from one time in the last 50 plus years, has failed to do so, this is a failure to comply with a written warranty or guarantee."  (ECF No. 35 at 44.)

Although Plaintiffs fail to reference a specific document in Count I of their complaint, they do indeed refer to REA's *Penn Lines* publication, bylaws, and articles of incorporation in other parts of the complaint.  Yet Plaintiffs do not allege to have ever seen or relied on the articles of incorporation, nor do they explain what warranties or guarantees it contains or were supposedly violated.[10]  That leaves the bylaws and *Penn Lines* publication.

Plaintiffs are correct that REA's bylaws contain certain warranties and guarantees regarding the legal status of members' patronage capital.  But the relevant provisions contradict Plaintiffs' allegation that these warranties and guarantees were violated.  Article VIII provides in part:

> In order to induce patronage and to assure that the Cooperative will operate on a non[-]profit basis the Cooperative is obligated to account on a patronage basis to all its patrons for all amounts received and receivable from the furnishing of electric energy and service.  ALL SUCH AMOUNTS IN EXCESS OF OPERATING

---

[9] *Penn Lines* is a monthly publication by REA, akin to a newsletter, which REA appears to send to its members.  (*See* ECF No. 1-1 ¶ 26 n.3.)  Plaintiffs attached the October 2011 *Penn Lines* issue to their complaint as Exhibit 2 (ECF No. 1-1 at 58).

[10] Plaintiffs dwell extensively on REA's articles of incorporation and its refusal to produce them (*see* ECF No. 35 at 8, 17, 18, 19, 21 & n.6, 26 & n.8, 29 n.9, 32 n.12, 34, 44 n.17), and request that the Court "impose a negative inference on [REA] in every regard where the Articles of Incorporation are at issue" based on REA's refusal.  (ECF No. 35 at 44 n.17.)  Plaintiffs also state that "[REA] is in sole custody and control of its Articles of Incorporation."  (*Id.* at 21 n.6.)  The Court notes that REA's articles of incorporation, like those of all Pennsylvania corporations, are public records available from the Pennsylvania Department of State.  They can be accessed by visiting https://www.corporations.pa.gov/search/corpsearch (last accessed June 8, 2017) and paying a fee of $3.00.  But Plaintiffs cannot base their UTPCPL claim on a document they do not possess and do not allege to have ever seen or relied on.

COSTS AND EXPENSES AT THE MOMENT OF RECEIPT BY THE COOPERATIVE ARE RECEIVED WITH THE UNDERSTANDING THAT THEY ARE FURNISHED BY THE PATRONS AS CAPITAL.  The books and records of the Cooperative shall be set up and kept in such a manner that at the end of each fiscal year the amount of capital, if any, so furnished by each patron is clearly reflected and credited in an appropriate record to the capital account of each patron.  *All such amounts credited to the capital account of any patron shall have the same status as though they had been paid to the patron in cash in pursuance of a legal obligation to do so and the patron had then furnished the Cooperative corresponding amounts for capital.*

(ECF No. 1-1 at 53 (emphasis in the form of italics added).)  The capitalized sentence stresses that all amounts paid by members in excess of REA's costs and expenses are provided by members as capital.  And the last quoted sentence is key; it clearly spells out that those excess amounts are deemed to have already been paid back to the members "in cash in pursuance of a legal obligation to do so," but then returned by the members to REA as capital.

The bylaws also explain under what circumstances patronage-capital refunds may be issued:

> *If*, at any time prior to dissolution or liquidation, the Board of Directors shall determine that the financial condition of the Cooperative shall not be impaired thereby, the capital then credited to patrons' accounts *may* be returned in full or in part.

(*Id.* (emphasis added).)  Such refunds are thus both discretionary and conditional; "if" is a conditional term, and "may" is a discretionary one.  REA therefore makes no warranty or guarantee that patronage capital will definitively be returned.  And nothing Plaintiffs have alleged appears to conflict with REA's representations in the bylaws regarding its treatment of patronage capital.  The bylaws simply do not contain the guarantees and warranties that

Plaintiffs seem to read into them. Plaintiffs therefore cannot plausibly assert a violation of a written warranty or guarantee based on REA's bylaws.

Plaintiffs fare slightly better by relying on the October 2011 issue of REA's *Penn Lines* publication. The October 2011 *Penn Lines* issue contains a question and answer section regarding patronage-capital refunds, which includes in relevant part the following:

> *Are capital credits refunded every year?*
> Each year, the REA Energy Board of Directors makes a decision on whether to refund capital credits based on the financial health of the cooperative. . . .
>
>                        \* \* \*
>
> *How often do members receive capital credits?*
> The REA Energy Board of Directors makes a decision each year whether or not to refund capital credits. When the cooperative is strong enough financially and the member equity levels are high enough, the board directs staff to refund some portion of past years' capital credits.

(ECF No. 1-1 at 58, 60.) These answers could be construed to contradict part of the discretionary nature of the refunds because they imply that the refunds are purely conditional rather than also discretionary; the answers omit the "may" portion that is included in the relevant section of REA's bylaws. Stated differently, the bylaws provide that a refund *may* be issued upon a finding by REA's board that REA's finances would not thereby be impaired, yet the *Penn Lines* answers could be read to suggest that a refund *will* be issued upon a finding by REA's Board that REA's finances would not be impaired.

Such a reading is tenuous because it overlooks that the answers provide that REA's board is still the relevant decisionmaker. (*Id.* at 58 ("the REA Energy Board of Directors makes a decision on whether to refund capital credits"), 60 ("The REA Energy Board of Directors makes a decision each year whether or not to refund capital credits.").) Nevertheless, the Court

holds that—at this stage—Plaintiffs have plausibly identified a written warranty or guarantee in the form of the answers in REA's October 2011 *Penn Lines* publication.[11]

Even so, their § 201-2(4)(xiv) claim fails because Plaintiffs have not alleged justifiable reliance on the answers in the October 2011 *Penn Lines* issue. To state a UTPCPL claim, Plaintiffs must allege that they "justifiably bought the product in the first place (or engaged in some other detrimental activity) because of the misrepresentation." *Hunt*, 538 F.3d at 222 n.4 (citing *Weinberg*, 777 A.2d at 446). Although Plaintiffs in their complaint repeatedly state that REA's conduct misled them and caused them to believe that REA would refund patronage capital when it was feasible to do so, they do not allege that they became members of REA—or took any other detrimental activity—based on the October 2011 *Penn Lines* answers. (*See* ECF No. 1-1 ¶¶ 44-58.)

Plaintiffs respond that this is "simply nonsensical because Plaintiffs have no other choice for their electricity service in their areas. In reality, Plaintiffs and the Proposed Class are/were [REA's] captive customers." (ECF No. 35 at 44.) It may very well be true that Plaintiffs have no other choice regarding where they obtain their electrical service. But that has no bearing on the UTPCPL's requirement that a plaintiff must allege justifiable reliance. To bring a private cause of action under the UTPCPL, the plaintiff personally has to have been deceived *and influenced* by the misrepresentation. *See Weinberg*, 777 A.2d at 444-46 (purchasers of Sunoco Ultra® gasoline who sued Sunoco under the theory that its advertisements were misleading had to allege that they "purchased Ultra® *because [they] heard and believed* Sunoco's false advertising." (emphasis

---

[11] But the Court makes no determination regarding whether the answers actually qualify as a warranty or guarantee. *See Tesauro v. Quigley Corp.*, No. 1011 Aug. Term 2000, 2001 WL 1807782, at *4 (Pa. C.P Apr. 9, 2001) ("Whether an [sic] statement creates an express warranty is an issue for the factfinder" (citing *Babcock Poultry Farm, Inc. v. Shook*, 203 A.2d 399, 401 (Pa. Super. Ct. 1964)).

added)).  The private-plaintiff standing requirement of justifiable reliance stands in contrast to the standing provision applicable to the Attorney General, § 201-4, which contains no such requirement.  Private plaintiffs, however, may pursue UTPCPL claims only when the alleged deceptive act prompted them to act to their detriment.  Here, Plaintiffs have not alleged that the October 2011 *Penn Lines* answers led them to become members of REA or take any other detrimental activity.  Their § 201-2(4)(xiv) claim therefore fails.

Plaintiffs have also not adequately pleaded a claim under the UTPCPL's catchall provision, § 201-2(4)(xxi).  To state a claim under the catchall provision, a plaintiff must allege: (1) a deceptive act that is likely to deceive a consumer acting reasonably under similar circumstances; (2) justifiable reliance; and (3) that the plaintiff's justifiable reliance caused ascertainable loss.  *See Slapikas*, 298 F.R.D. at 292 (citing *Seldon*, 647 F. Supp. 2d at 470).  For the reasons discussed above, even if the Court assumes that the first element—a deceptive act that is likely to deceive a consumer acting reasonably under similar circumstances—is satisfied based on the *Penn Lines* answers, Plaintiffs have failed to allege justifiable reliance—and by extension have failed to allege ascertainable loss resulting from justifiable reliance.  Plaintiffs' UTPCPL claim will therefore be dismissed.

### C.      Count II—Breach of the Covenant of Good Faith and Fair Dealing

In Count II of their complaint, Plaintiffs allege a breach of the covenant of good faith and fair dealing.  Plaintiffs state that they have a valid contract with REA, that every contract inherently contains an implied covenant of good faith and fair dealing, and that this covenant obligates REA to "make the decision of whether to return Patronage Capital reasonably and in good faith."  (ECF No 1-1 ¶ 59.)  Plaintiffs contend that REA's decision not to refund capital

credits is unrelated to REA's financial condition and argue that REA has therefore violated the covenant of good faith and fair dealing.

REA offers three arguments for why this claim should be dismissed. First, REA argues that the covenant of good faith and fair dealing is applicable only in situations involving some special relationship between the parties, such as a confidential or fiduciary relationship, and that such a relationship does not exist here. Second, REA argues that under Pennsylvania law a claim for breach of the covenant of good faith and fair dealing is not an independent cause of action separate from a breach-of-contract claim. REA reasons that the claim for breach of the covenant of good faith and fair dealing cannot be maintained because Plaintiffs allege a claim for breach of contract. And third, REA argues that the covenant of good faith and fair dealing cannot override an express contractual term or defeat a party's express contractual rights—and that this is precisely what Plaintiffs seek to do, making dismissal of this claim proper.

The covenant of good faith and fair dealing, sometimes called the duty of good faith and fair dealing, finds its origins in American common law and was codified by the American Law Institute as § 205 of the Restatement (Second) of Contracts. *See* Restatement (Second) of Contracts § 205 ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."). Under Pennsylvania law, the covenant "attaches to existing contractual obligations; it does not add new contractual duties." *Hanaway v. Parkesburg Grp., LP*, 132 A.3d 461, 471 (Pa. Super. Ct. 2015). The covenant in essence "infuses the parties' performance of their express contractual obligations." *Id.* at 472. Although a complete list of what qualifies as bad faith conduct is impossible, it includes "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of

a power to specify terms, and interference with or failure to cooperate in the other party's performance." *Somers v. Somers*, 613 A.2d 1211, 1213 (Pa. Super. Ct. 1992) (citing Restatement (Second) of Contracts § 205(d))

As one Pennsylvania court has noted, "[t]he implied contractual covenant, or duty, of good faith is a legal concept shrouded in mystery and confusion in Pennsylvania." *JHE, Inc. v. Se. Pa. Transp. Auth.*, No. 1790 Nov. Term 2001, 2002 WL 1018941, at *5 (Pa. C.P. May 17, 2002). One reason for this confusion is that Pennsylvania courts have been less than clear on whether the covenant applies to all contracts or only certain types of contracts. For example, the Pennsylvania Superior Court has adopted § 205 of the Restatement (Second) of Contracts. *Kaplan v. Cablevision of PA, Inc.*, 671 A.2d 716, 721-72 (Pa. Super. Ct. 1996) (reaffirming that the Pennsylvania Superior Court has adopted § 205 and citing cases). And the Pennsylvania Superior Court has stated and suggested that the covenant does indeed apply to all contracts. *See, e.g., Hanaway*, 132 A.3d at 469-70 (noting that Pennsylvania's intermediate-appellate courts have applied § 205 and mentioning the "general duty of contracting parties to perform their contractual obligations in good faith as set forth in" § 205); *Donahue v. Fed. Express Corp.*, 753 A.2d 238, 242 (Pa. Super. Ct. 2000) ("Every contract in Pennsylvania imposes on each party a duty of good faith and fair dealing in its performance and its enforcement." (citing *Kaplan v. Cablevision of Pa., Inc.*, 671 A.2d 716, 722 (Pa. Super. Ct. 1996))); *Liazis v. Kosta, Inc.*, 618 A.2d 450, 454 (Pa. Super. Ct. 1992) ("Fundamentally, every contract imposes upon the parties a duty of good faith and fair dealing in the performance and enforcement of the contract." (citing *Germantown Mfg. Co. v. Rawlinson*, 491 A.2d 138, 148 (Pa. Super. Ct. 1985))). But the Pennsylvania Superior Court has at other times used less sweeping language. *See, e.g., Heritage*

*Surveyors & Eng'rs, Inc. v. Nat'l Penn Bank*, 801 A.2d 1248, 1253 (Pa. Super. Ct. 2002) ("In Pennsylvania, the duty of good faith has been recognized in limited situations."); *Creeger Brick & Bldg. Supply Inc. v. Mid-State Bank & Trust Co.*, 560 A.2d 151, 153 (Pa. Super. Ct. 1989) ("In this Commonwealth the duty of good faith has been recognized in limited situations."). Similarly, the Commonwealth Court of Pennsylvania has also stated that the covenant applies only in limited circumstances. *See, e.g.*, *Agrecycle, Inc. v. City of Pittsburgh*, 783 A.2d 863, 867 (Pa. Commw. Ct. 2001) ("In Pennsylvania, the courts have recognized the duty of good faith only in limited situations." (citing cases)); *Dep't of Transp. v. E-Z Parks, Inc.*, 620 A.2d 712, 717 (Pa. Commw. Ct. 1993) ("[The] duty of good faith is limited to situations where there is some special relationship between the parties, such as a confidential or fiduciary relationship.))

The Pennsylvania Supreme Court is aware of the tension between these cases but has not resolved the conflict. In *Ash v. Continental Insurance Co.*, 932 A.2d 877 (Pa. 2007), the Pennsylvania Supreme Court remarked on the "considerable disagreement over the applicability of the implied duty of good faith" and noted that some Pennsylvania courts—as well as certain members of the Pennsylvania Supreme Court—have opined that Pennsylvania has adopted § 205. 932 A.2d at 883 n.2. In the same discussion, the *Ash* court cited a federal district-court decision from the Eastern District of Pennsylvania, *Fraser v. Nationwide Mutual Insurance Co.*, 135 F. Supp. 2d 623 (E.D. Pa. 2001), which "reconciled the conflicting case law, determining [that], '[u]nder Pennsylvania [l]aw, a covenant of good faith and fair dealing is implied in every contract. However, it does not create a cause of action in every case.'" *Id.* (citing *Fraser*, 135 F. Supp. 2d at 643). Despite describing *Fraser*'s view on the conflict, the Pennsylvania Supreme Court went on to note that it had not yet in a precedential opinion

addressed the conflicting cases or adopted § 205, and that it declined to do so in *Ash* because the issue was not before the court. *Id.*

The *Fraser* court, in drawing its conclusion on the state of Pennsylvania law as it relates to the covenant of good faith and fair dealing, relied on precedent from the United States Court of Appeals for the Third Circuit, including *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78 (3d Cir. 2000). 135 F. Supp. 2d at 643-44. In *Northview Motors*, the Third Circuit likewise noted that Pennsylvania courts have cited § 205 for the proposition that every contract implicitly contains the covenant, but acknowledged that "[i]n practice . . . the courts have recognized an independent cause of action for breach of a duty of good faith and fair dealing only in very limited circumstances." 227 F.3d at 91 (citing cases). In the Third Circuit's view, "[c]ourts have utilized the good faith duty as an interpretive tool to determine the parties' justifiable expectations in the context of a breach of contract action, but that duty is not divorced from the specific clauses of the contract and cannot be used to override an express contractual term." *Id.* at 91 (citing cases). Thus, the Third Circuit held that "a party is not entitled to maintain an implied duty of good faith claim where the allegations of bad faith are 'identical to' a claim for 'relief under an established cause of action.'" *Id.* at 91-92 (quoting *Parkway Garage, Inc. v. City of Philadelphia*, 5 F.3d at 701-02).

Based on a review of these cases, the Court finds that the views expressed in *Northview Motors* and *Fraser* accurately describe the state of Pennsylvania law regarding the covenant of good faith and fair dealing. It appears that most of the confusion surrounding the applicability of the covenant stems from the conflation of two distinct questions, namely (1) whether the covenant applies to a contract, and (2) whether the covenant supports a claim (be it as an

independent claim or as a breach-of-contract claim). *Cf. Phila. Plaza-Phase II v. Bank of Am. Nat. Trust & Sav. Ass'n*, No. 3745 April Term 2002, 2002 WL 1472337, at *6 (Pa. C.P. June 21, 2002) ("Those decisions relying on *Creeger Brick* to avoid the covenant of good faith and to narrow its application appear to confuse the *existence* of the covenant with the alleged *breach* of the covenant and to expand *Creeger Brick* into unintended areas."). This conflation is apparent in some of the decisions which stress the limited applicability of the covenant. *See, e.g., Heritage Surveyors*, 801 A.2d at 1253-54 (stating that covenant did not *apply* to promissory note but relying on precedent which held that similar conduct did not *violate* covenant); *E-Z Parks*, 620 A.2d at 717 (holding that covenant did not apply but rejecting breach-of-covenant claim based in part on unambiguous contractual terms and lack of any bad faith); *see also Creeger Brick*, 560 A.2d at 153-54 (stating that Pennsylvania recognizes covenant in limited situations but holding that conduct did not support breach-of-covenant claim).

In this case, the Court will avoid conflating those questions by answering the second question—whether the covenant supports a claim—only. The Court need not decide whether the covenant applies because, regardless of the answer, it does not support any claim here. As noted above, although "[c]ourts have utilized the good faith duty as an interpretive tool to determine the parties' justifiable expectations in the context of a breach of contract action, . . . that duty is not divorced from the specific clauses of the contract and cannot be used to override an express contractual term." *Northview*, 227 F.3d at 91. And here, express contractual terms govern the relief Plaintiffs seek:

> *If*, at any time prior to dissolution or liquidation, the Board of Directors shall determine that the financial condition of the

> Cooperative shall not be impaired thereby, the capital then
> credited to patrons' accounts *may* be returned in full or in part.

(ECF No. 1-1 at 53 (emphasis added).)  Under these express terms, REA—and not Plaintiffs—

decides when and whether to retire capital credits.

Plaintiffs seek to read a good-faith duty into this provision that would "operate[] to limit

[REA]'s self-professed unfettered discretion" regarding when to refund capital.  (ECF No. 35 at

38.)  But such a duty would contradict the express terms of the contract, which provide that

REA is the relevant decisionmaker.  And these terms impose no constraint on REA's discretion.

A different conclusion might follow if the bylaws provided something like "the board of

directors shall, from time to time, determine whether the cooperative's financial condition

would be impaired by refunding patronage capital, and the board shall refund patronage

capital upon a finding that the Cooperative's financial condition would not thereby be

impaired."  But that is not what the bylaws say, and Plaintiffs have no right to unilaterally

rewrite them.

Furthermore, a plaintiff cannot maintain an action for breach of the implied covenant of

good faith and fair dealing where an "adequate remedy exists under . . . [a] claim for breach of

contract."  *Geesey v. CitiMortgage, Inc.*, 135 F. Supp. 3d 332, 346 (W.D. Pa. 2015) (citation

omitted); *see also Hudgins v. Travelers Home and Marine Ins. Co.*, No. 11-cv-882, 2013 WL 3949208,

at *5 (E.D. Pa. July 31, 2013) ("[T]he claim for breach of the implied covenant of good faith and

fair dealing is subsumed by the breach of contract claim"); *Cummings v. Allstate Ins. Co.*, 832 F.

Supp. 2d 469, 473 (E.D. Pa. 2011) ("under Pennsylvamia law, there is no separate cause of action

for breach of the duty of good faith and fair dealing and . . . such a claim is subsumed within a

breach of contract claim"); *McHale v. NuEnergy Group*, No. 01-cv-4111, 2002 WL 321797, at *8 (E.D. Pa. Feb. 27, 2002) (dismissing breach-of-covenant claim because "the actions forming the basis of the breach of contract claim are essentially the same as the actions forming the basis of the [breach-of-covenant] claim" (citation omitted)).  Here, Plaintiffs have alleged both a breach-of-contract and breach-of-covenant claim, and the allegations in support of both claims are essentially the same.  Plaintiffs, however, cannot maintain both claims.

Plaintiffs' arguments to the contrary are unpersuasive.  They argue that they are permitted to plead in the alternative, that their breach-of-covenant claim is not based on contractual provisions, and cite *Kamco Indus. Sales, Inc. v. Lovejoy, Inc.*, 779 F. Supp. 2d 416, 427-29 (E.D. Pa. 2011), for the proposition that the covenant properly limits contractual discretion. (*See* ECF No. 35 at 37-39.)

First, although Plaintiffs are allowed to plead in the alternative, that fact has no bearing on the outcome here.  Even if Plaintiffs were pleading only one of these claims, the Court's substantive analysis—regardless of what it called the claim—would be identical.  *See McAllister v. Royal Caribbean Cruises, Ltd.*, No. 02-cv-2393, 2003 WL 23192102, at *4 (E.D. Pa. Sept. 30, 2003) (concluding that a breach-of-covenant claim is simply a breach-of-contract claim).  And the Court will address Plaintiffs' breach-of-contract claim below.  That Plaintiffs are pleading their breach-of-covenant claim in the alternative is thus of no consequence.

Second, Plaintiffs' assertion that their breach-of-covenant claim is "not based on provisions in the contract" (ECF No. 35 at 38) is not credible.  The bylaws directly address the subject matter of this claim, namely the refunding of patronage capital, and Plaintiffs—through their breach-of-covenant claim—seek to read terms into the bylaws.  The claim is thus based on

a contractual provision. And even if the breach-of-covenant claim was not "based" on a contractual provision, it would nevertheless be barred because Plaintiffs seek to "override an express contractual term." *Northview*, 227 F.3d at 91.

Third, Plaintiffs' reliance on *Kamco*, 779 F. Supp. 2d at 427-29, as an example of how the covenant properly limits contractual discretion is misplaced. A brief recitation of the facts of that case is needed to illustrate why it does not support Plaintiffs' argument. In *Kamco*, Kamco Industrial Sales, Inc., had a sales agreement with a manufacturer, Lovejoy, Inc. Under that agreement, Kamco was to receive commissions on all Lovejoy products it sold, with the exception of products sold to specified House Accounts. Lovejoy, however, contractually reserved the right to redefine the House Accounts. After Lovejoy experienced financial woes, it sought to terminate the contract with Kamco's consent and threatened to convert all of Kamco's customers to House Accounts if Kamco refused. Kamco refused, after which Lovejoy mostly followed through on its threat and converted 90% of Kamco's customers to House Accounts. Kamco sued, alleging among other things a breach-of-contract claim predicated on a breach of the covenant of good faith and fair dealing. On summary judgment, Lovejoy argued that the sales agreement gave it unfettered discretion to redefine Kamco's customers to House Accounts.

The court disagreed and, relying on the covenant, held that "Kamco possessed a justifiable expectation that, at a minimum, Lovejoy would not use its discretion under the House Accounts provision to deprive Kamco of its benefits under the Agreement by redefining all or substantially all of Kamco's accounts as House Accounts." *Kamco*, 779 F. Supp. 2d at 429. But the court applied the covenant only after it determined that the contractual provision was ambiguous, and did so because Lovejoy's interpretation of the account-conversion provision

would render superfluous significant portions of the sales agreement, including the termination provision. *See id.* at 427-29. The court noted that the carve-out for sales to House Accounts was defined as an exception to the general rule that Lovejoy would pay commission on sales and therefore found that it was questionable whether Lovejoy could redefine almost all accounts to fit under this exception.

Here, even under *Kamco*'s reasoning, Plaintiffs' claim fails because no comparable contractual conflict or ambiguity exists. REA's discretion to refund patronage capital does not nullify or infringe on any other contractual provisions and the relevant provision unambiguously provides that REA decides when and whether to retire capital credits. *Kamco* thus lends no support to Plaintiffs' claim.

Plaintiffs' claim for breach of the covenant of good faith and fair dealing will therefore be dismissed.

### D.    Count III—Breach of Contract

In Count III, Plaintiffs assert a claim for breach of contract. To state a breach-of-contract claim, a plaintiff must plead three elements: (1) the existence of a contract, including its essential terms; (2) a breach of that contract; and (3) damages. *Omicron Sys., Inc. v. Weiner*, 860 A.2d 554, 564 (Pa. Super. Ct. 2004). Here, the first element is satisfied because Plaintiffs have alleged the existence of a contract (REA's bylaws), as well as its essential terms by attaching the bylaws to their complaint.[12] (*See* ECF No. 1-1 ¶¶ 11-12.) Similarly, the third element—damages—is satisfied because Plaintiffs allege that REA's purported breach deprives Plaintiffs of money that

---

[12] Plaintiffs also assert that REA's articles of incorporation are a contract between Plaintiffs and REA. (*See* ECF No. 1-1 ¶ 11.) As noted in footnote 10, however, Plaintiffs do not possess REA's articles of incorporation and do not allege any of the articles' essential terms. The Court will therefore consider only REA's bylaws.

they are entitled to.  (*See id.* ¶ 28.)  But Plaintiffs' breach-of-contract claim falters on the second

element; they have not alleged a plausible breach.

As to breach, Plaintiffs contend that

> [w]here the relevant agreement[ ] between Defendant REA and its
> members do not specify how often Defendant REA will return
> Patronage Capital, to prevent the contract from being too
> indefinite or from placing Plaintiffs and the class at Defendant's
> mercy, the agreement[] should be deemed to contain an implied
> contractual term mandating that Patronage Capital shall be
> returned "from time to time" in accordance with Pennsylvania
> Law and the Principles of Cooperative Enterprises.

(ECF No. 1-1 ¶ 69.)  They reason that "Defendant REA breached this implied contractual term

by failing to appropriately and timely return Patronage Capital to Plaintiffs and the Class

Members."  (*Id.* ¶ 70.)  The Court will also construe Plaintiffs' allegations regarding the

covenant of good faith and fair dealing as a basis for their breach-of-contract claim.  These

allegations differ slightly from the breach-of-contract allegations; rather than assert that an

implied term should be read into the contract, Plaintiffs in these allegations contend that REA

has an obligation to "make the decision of whether to return Patronage Capital reasonably and

in good faith."  (*Id.* ¶ 59.)

The Court turns first to Plaintiffs' reliance on Pennsylvania statutory law.  As the Court

explained in its preemption discussion above, Plaintiffs allege that 15 Pa. Cons. Stat. § 7330

obligates REA to return patronage capital to its members.  (ECF No. 1-1 ¶ 19.)  To review,

§ 7330(a) requires that electric cooperatives be operated without profit to their members.

Furthermore, § 7330(b) mandates that revenues be used to first pay "operating and maintenance

expenses and the principal and interest on outstanding obligations and, thereafter, to such

reserves for improvement, new construction, depreciation and contingencies as the board may, from time to time, prescribe." Revenues not required for these purposes

> shall be returned, from time to time, to the members on a pro rata basis, according to the amount of business done with each during the period, either in cash, in abatement of current charges for electric energy or otherwise, as the board determines, but the return may be made by way of general rate reduction to members if the board so elects.

§ 7330(c). Plaintiffs rely primarily on § 7330(c)'s language that excess revenues "shall be returned, from time to time" to argue that REA is in breach.

As Plaintiffs point out, the bylaws provide that REA "is a cooperative corporation governed by the Pennsylvania Electric Cooperative Law of 1990 (15 Pa.C.S.§ 7301 et. seq.)." (ECF No. 1-1 at 36.) And—subject to some exceptions not applicable here—"the terms of a contract often include the state law relating to the contract." *Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 370 (3d Cir. 2012) (citing *Farmers' & Merchs.' Bank of Monroe v. Fed. Reserve Bank of Richmond*, 262 U.S. 649, 660 (1923)); *see also Willisch v. Nationwide Ins. Co. of Am.*, 852 F. Supp. 2d 582, 607 (E.D. Pa. 2012) ("Statutes that pertain to the subject matter of a contract 'form a part of the contractual obligation as if actually incorporated into the contract.'" (citation omitted)). Thus, through both explicit reference in the bylaws and background principles of law, § 7330 is effectively part of the contract between REA and Plaintiffs.

Nevertheless, there is no violation of § 7330 here, and thus no breach of contract on that basis. Plaintiffs argue that "[t]o the extent . . . Defendant REA's *By-Laws* grant the Board of Directors absolute discretion over whether Current and/or Former Member's Patronage Capital is ever retired and returned to them, the *By-Laws* clearly conflict with the 'time to time'

requirement set forth in 15 Pa.C.S. § 7330." (ECF No. 1-1 ¶ 20.) But § 7330 explicitly relies on the discretion of cooperatives' boards of directors, and REA's use of that discretion here does not run afoul of § 7330.[13]

Plaintiffs appear to contend that § 7330(c) obligates REA to refund patronage capital through a cash refund, abatement, or rate reduction. But that is not what § 7330(c) says. Although § 7330(c) requires that excess revenues be returned from time to time, the cooperative's board gets to decide what form those returns take. In this case, Article VIII of REA's bylaws reflects the board's decision on the form of returns:

> In order to induce patronage and to assure that the Cooperative will operate on a non profit basis the Cooperative is obligated to account on a patronage basis to all its patrons for all amounts received and receivable from the furnishing of electric energy and service. ALL SUCH AMOUNTS IN EXCESS OF OPERATING COSTS AND EXPENSES AT THE MOMENT OF RECEIPT BY THE COOPERATIVE ARE RECEIVED WITH THE UNDERSTANDING THAT THEY ARE FURNISHED BY THE PATRONS AS CAPITAL. The books and records of the Cooperative shall be set up and kept in such a manner that at the end of each fiscal year the amount of capital, if any, so furnished by each patron is clearly reflected and credited in an appropriate record to the capital account of each patron. All such amounts credited to the capital account of any patron shall have the same status as though they had been paid to the patron in cash in pursuance of a legal obligation to do so and the patron had then furnished the Cooperative corresponding amounts for capital.

---

[13] Although §§ 7330(a) and (b) impose restrictions on the use of revenues, § 7330(b) authorizes boards to designate "reserves for improvement, new construction, depreciation and contingencies." Section 7330(c) goes on to exempt those reserves from the mandated refunds by providing that "[r]evenues *not required for the purposes set forth in subsection (b)* shall be returned" (emphasis added). Even if a board does not set aside reserves, however, it still retains discretion regarding the manner in which excess revenues are to be refunded. *See* § 7330(c) (refunds shall be made "either in cash, in abatement of current charges for electric energy *or otherwise, as the board determines*" (emphasis added)).

(ECF No. 1-1 at 53.)  Thus, REA's board has determined that excess revenues are to be refunded as capital-account credits.  This method falls within § 7330(c)'s language that refunds may be made in a form determined by the board.  *See Caver v. Cent. Ala. Elec. Coop.*, 845 F.3d 1135, 1147 (11th Cir. 2017) (holding that capital-account credits, as provided for in a cooperative's bylaws, are a permissible refund method under an Alabama statute similar to § 7330(c)).

Additionally, it matters that Plaintiffs and REA have contractually agreed that capital credits are deemed funds that have already been returned to Plaintiffs and then paid back to REA.  Article VIII provides that

> [a]ll . . . amounts credited to the capital account of any patron *shall have the same status as though they had been paid to the patron in cash in pursuance of a legal obligation* to do so and the patron had then furnished the Cooperative corresponding amounts for capital.

(ECF No. 1-1 at 53 (emphasis added).)  This further undermines Plaintiffs' argument of breach; they have already agreed that excess funds are deemed to have been returned.  *Cf. Caver v. Cent. Ala. Elec. Coop.*, No. 15-cv-0129, 2015 WL 5286501, at *7 (S.D. Ala. Sept. 8, 2015) (holding that this same language in another cooperative's bylaws eliminated "the distinction between cash payouts and capital account credits").  For these reasons, § 7330(c) offers no basis for Plaintiffs' breach-of-contract claim.

Similarly, the Principles of Cooperative Enterprises also offer no basis for Plaintiffs' breach-of-contract claim.  Plaintiffs have not explained what the legal significance of these Principles is in relation to their breach-of-contract claim, or how they would give rise to contractual obligations.  It may be that REA's adherence to some of these Principles bears on its tax liabilities.  *See Buckeye Power, Inc. v. United States*, 38 Fed. Cl. 154, 159-61 (1997) (discussing

the defining traits of cooperatives as well as some of the Principles of Cooperative Enterprises and the relation of both to certain federal tax exemptions).  But there is no indication that REA's alleged failure to abide by some of them would give rise to a breach-of-contract claim.

Nor does the so-called doctrine of necessary implication, which Pennsylvania recognizes, justify reading implied terms regarding the refunding of capital into REA's bylaws. The doctrine of necessary implication allows courts to imply a contractual term "where it is clear that an obligation is within the contemplation of the parties at the time of the contracting or is necessary to carry out their intentions."  *Slater v. Pearle Vision Center, Inc.*, 546 A.2d 676, 679 (Pa. Super. Ct. 1988) (citation omitted).  Stated differently, the doctrine of necessary implication provides that, "[i]n the absence of an express provision, the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made and to refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract."  *John B. Conomos, Inc. v. Sun Co. (R&M)*, 831 A.2d 696, 706 (Pa. Super. Ct. 2003) (quoting *Daniel B. Van Campen Corp. v. Bldg. & Constr. Trades Council of Phila.*, 195 A.2d 134, 136-37 (Pa. Super. Ct. 1963)).  But any terms implied through the doctrine "cannot trump the express provisions in the contract."  *Id.* (citing *Kaplan v. Cablevision of PA, Inc.*, 671 A.2d 716, 720 (Pa. Super. Ct. 1996)); *see also Stewart v. SWEPI, LP*, 918 F. Supp. 2d 333, 342 (M.D. Pa. 2013) ("Implied conditions and rights yield where the terms of a contract dictate otherwise." (citing *Creeger Brick*, 560 A.2d at 154)).  And a court "may apply the doctrine . . . in only limited circumstances; it may imply a missing term in a parties' contract only when it is necessary to

prevent injustice *and it is abundantly clear that the parties intended to be bound by such term*." *Kaplan*, 671 A.2d at 720 (emphasis added and citation omitted).

Here, the doctrine of necessary implication is inapplicable because the implied terms Plaintiffs seek—terms which would require REA to refund patronage capital in the manner desired by Plaintiffs—would override express contractual terms. Moreover, there is no indication that REA intended to be bound by any such implied terms. The provision actually indicates the opposite. The doctrine of necessary implication is thus inapplicable.

The covenant of good faith and fair dealing does not support a breach-of-contract claim for the same reasons. The covenant "is akin to the contract doctrine of necessary implication" and is likewise "tied specifically to and is not separate from the duties a contract imposes on the parties." *Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418, 434 n.11 (Pa. 2001). Because Plaintiffs' proposed application of the covenant of good faith and fair dealing would supplant express contractual terms, it is inapplicable here. Plaintiffs' breach-of-contract claim will therefore be dismissed.

E.        Count IV—Unjust Enrichment

In the alternative, Plaintiffs assert a claim for unjust enrichment. As REA argues, however, "the doctrine of quasicontract, or unjust enrichment, is inapplicable where a written or express contract exists." *Lackner v. Glosser*, 892 A.2d 21, 34 (Pa. Super. Ct. 2006); *see also Wilson Area Sch. Dist. v. Skepton*, 895 A.2d 1250, 1254 (Pa. 2006) ("it has long been held in this Commonwealth that the doctrine of unjust enrichment is inapplicable when the relationship between parties is founded upon a written agreement or express contract"). Plaintiffs point out that they are entitled to plead in the alternative, and that their unjust-enrichment claim is

proper because "there are provisions of the contract that directly conflict with Pennsylvania law, [and that] the contract, or the conflicting provisions, may be stricken." (ECF No. 35 at 40 (footnote omitted).)

It is true that Pennsylvania adheres to "the general rule that an agreement which violates a provision of a statute, or which cannot be performed without violation of such a provision, is illegal and void." *Am. Ass'n of Meat Processors v. Cas. Reciprocal Exch.*, 588 A.2d 491, 495 (Pa. 1991) (quoting *Dippel v. Brunozzi*, 74 A.2d 112, 114-15 (Pa. 1950)). But—as discussed above—there is no conflict between REA's bylaws and Pennsylvania law, meaning the bylaws are a valid contract between Plaintiffs and REA. And because there is no doubt about the validity of the contract, alternative pleading is inapplicable. Plaintiffs' unjust-enrichment claim will therefore be dismissed.

### F. Count VI—Breach of Fiduciary Duty by Agent or Trustee

In Count VI of their complaint, Plaintiffs assert a claim for breach of fiduciary duty. Plaintiffs contend that REA is their agent or trustee, that REA therefore has a fiduciary duty toward Plaintiffs, and that REA breached this duty by not returning patronage capital to Plaintiffs and by not paying interest on that capital. REA offers four arguments in support of dismissal of this claim. Specifically, REA argues that this claim is barred by both the gist-of-the-action doctrine and the economic-loss rule, and that Plaintiffs have failed to plead facts to support the inference that REA either owed Plaintiffs a fiduciary duty or that REA breached that duty. Because the Court holds that this claim is barred by the gist-of-the-action doctrine, it does not address REA's other arguments.

Pennsylvania courts "are cautious about permitting tort recovery on contractual breaches." *Brown & Brown, Inc. v. Cola*, 745 F. Supp. 2d 588, 619 (E.D. Pa. 2010) (citing *Glazer v. Chandler*, 200 A.2d 416, 418 (Pa. 1964)). The gist-of-the-action doctrine thus exists to maintain the conceptual distinction between tort and contract claims; the doctrine "precludes plaintiffs from re-casting ordinary breach of contract claims into tort claims." *eToll, Inc. v. Elias/Savion Advert., Inc.*, 811 A.2d 10, 14 (Pa. Super. Ct. 2002) (citation omitted). Although the existence of a contractual relationship does not in and of itself bar a tort claim, the gist-of-the-action doctrine "forecloses a party's pursuit of a tort action for the mere breach of contractual duties, without any separate or independent event giving rise to the tort." *Brown*, 745 F. Supp. 2d at 588 (internal quotation marks and citation omitted). Similar to the gist-of-the action doctrine, the economic-loss rule "prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract." *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 618 (3d Cir. 1995).

A claim for breach of fiduciary duty is thus barred by the gist-of-the-action doctrine if the fiduciary duty alleged is grounded in contractual obligations. *See eToll*, 811 A.2d at 19. But claims for breach of fiduciary duty and breach of contract can coexist if the fiduciary duty alleged is based on duties imposed as a matter of social policy, rather than based on duties imposed by contractual agreement. *See Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 103-04 (3d Cir. 2001).

It is readily apparent that the breach of fiduciary duties alleged by Plaintiffs concern matters addressed by contractual provisions. Plaintiffs assert that "REA has violated and continues to violate its fiduciary duties as an agent or trustee by, inter alia, failing to return the

Patronage Capital of Plaintiffs and the Class Members and by failing to pay interest to them on the Patronage Capital that could have been returned but, arbitrarily, was not returned." (ECF No. 1-1 at 32.) But as discussed above in connection with Plaintiffs' breach-of-contract claim, the return of patronage capital is governed by Article VIII of REA's bylaws—and is thus a contractual matter. Article VIII likewise specifically addresses the payment of interest on patronage capital; it provides that "[n]o interest or dividends shall be paid or payable by the Cooperative on any capital furnished by its patrons." (*Id.* at 53.) Thus, Plaintiffs' claim for breach of fiduciary duty is predicated on contractual duties—and is therefore barred by the gist-of-the-action doctrine. *See Cunningham Lindsey U.S., Inc. v. Bonnani*, No. 13-cv-2528, 2014 WL 1612632, at *7 (M.D. Pa. Apr.22, 2014) (dismissing claim for breach of fiduciary duty because the claim was "governed entirely" by defendants' contracts and the plaintiff "failed to allege any conduct underlying its fiduciary duty . . . claim[ ] that [was] not contemplated by the defendants' contracts").

As they did in support of their unjust-enrichment claim, Plaintiffs argue that they are permitted to plead in the alternative and that their claim for breach of fiduciary duty is proper because the bylaws may be contrary to law. The Court held above, however, that the contract is valid; alternative pleading is therefore inapplicable in the context of Plaintiffs' claim for breach of fiduciary duty.

Plaintiffs argue also that their claim for breach of fiduciary duty should be permitted to proceed because it is nevertheless based on a breach of duties imposed by social policy. Plaintiffs refer back to the Principles of Cooperative Enterprise and assert that REA's refusal to return patronage capital "is a matter of social policy and a betrayal of the cooperative

principles." (ECF No. 35 at 31.) Yet Plaintiffs cite no authority—and this Court is aware of none—for the notion that these guiding principles give rise to obligations of social policy.[14] Plaintiffs also reference provisions of Pennsylvania's Electric Cooperative Law of 1990— specifically 15 Pa. Cons. Stat. §§ 7322 and 7330—and appear to argue that these provisions give rise to obligations of social policy. But, as the Court explained above in its discussion regarding Plaintiffs' breach-of-contract claim, § 7330 does not impose the obligations Plaintiffs reads into them. And § 7322 merely vests the authority to formulate bylaws in cooperatives' boards of directors and directs that those bylaws may not be inconsistent with law. It imposes no additional obligations of social policy.

In this case, the parties' obligations are defined by contract. And Plaintiffs have identified no cognizable social policy upon which their claim for breach of fiduciary duty is based. This claim is therefore barred by the gist-of-the-action doctrine and will thus be dismissed.

### G. Count V—Declaratory & Injunctive Relief

In their remaining claim, Plaintiffs request extensive declaratory relief. As a threshold matter, a question exists under what law Plaintiffs' declaratory-relief claim arises. This case began in state court and was later removed by REA to this Court. Thus, although Plaintiffs do not cite it, they presumably relied on Pennsylvania's Declaratory Judgment Act, 75 Pa. Cons. Stat. §§ 7531-41, for their declaratory-judgment claim. In adjudicating state-law claims, "federal courts are to apply state substantive law and federal procedural law." *Hanna v. Plumer*, 380 U.S.

---

[14] In the context of a claim for breach of fiduciary duty, the phrase "obligation of social policy" refers to "the larger social policies embodied in the law of torts." *See Bash v. Bell Tel. Co.*, 601 A.2d 825, 830 (Pa. Super. Ct. 1992).

460, 465 (1965). Claims for declaratory judgment are "procedural in nature and purpose," meaning federal law governs such claims. *Munich Welding, Inc. v. Great Am. Ins. Co.*, 415 F. Supp. 2d 571, 574 (W.D. Pa. 2006) (quoting *Federal Kemper Ins. Co. v. Rauscher*, 807 F.2d 345, 352 (3d Cir. 1986) for the proposition that "it is settled law that, as a procedural remedy, the federal rules respecting declaratory judgment apply in diversity cases")). The Court therefore construes Plaintiffs' declaratory-judgment claim as arising under the federal Declaratory Judgment Act, 28 U.S.C. §§ 2201-02. *See id.* (applying, after removal of case to federal court, 28 U.S.C. § 2201 to claim filed in state court under Pennsylvania's Declaratory Judgment Act); *Hatchigian v. State Farm Ins. Co.*, No. 13-cv-2880, 2014 WL 176585, at *6 n.4 (E.D. Pa. Jan. 16, 2014) (same).

In this claim, Plaintiffs request the following relief:

> 81. An order is sought declaring Defendant REA's obligation to return the Patronage Capital of Plaintiffs and Class Members and permanently enjoining it from its practice of not returning Patronage Capital to Plaintiffs and Class Members.
>
> 82. An order is sought declaring that an implied trust arises between Defendant REA as a fiduciary and its Current and Former Members as beneficiaries with regard to Patronage Capital.
>
> 83. An order is sought declaring that Defendant REA has breached its fiduciary duties to Plaintiffs and Class Members with respect to the retirement and return of Patronage Capital.
>
> 84. An order is sought declaring that Defendant REA has breached its fiduciary duties to Plaintiffs and the Class Members to pay interest on Patronage Capital retained by Defendant REA.
>
> 85. An order is sought declaring that Defendant REA has breached its fiduciary duties to Plaintiffs and the Class

Members and abused its discretion by failing to return Patronage Capital to Plaintiffs and the Class Members.

86.     An order is sought declaring that Defendant REA has breached its fiduciary duties to Plaintiffs and the Class Members by Defendant's lack of meaningful effort in locating those Current and Former Members who have not accepted checks for retired Patronage Capital in 2011.

87.     An order is sought declaring that fairness and equity require the Court to appoint an independent Trustee or Receiver over Plaintiffs and the Class Members' Patronage Capital with appropriate powers to ensure Plaintiffs and the Class Members are repaid or at a minimum properly compensated.

(ECF No. 1-1 ¶¶ 81-87.)  Yet these requests for relief are all derivative of Plaintiffs' other claims.

Thus, because Plaintiffs' other claims fail to state actionable grounds for relief, their claim for declaratory relief will likewise be dismissed.  *See Acosta v. Target Corp.*, No. 05-cv-7068, 2013 WL 3456767, at *19 (N.D. Ill. July 3, 2013) (plaintiffs' claims for an implied trust and declaratory relief failed as a matter of law because they were derivative of claims upon which defendant was entitled to summary judgment), *aff'd*, 745 F.3d 853 (7th Cir. 2014); *Roberts v. McCarthy*, No. 11-cv-00080, 2011 WL 1363811, at *4 (D. Nev. Apr. 11, 2011) ("Because Defendants have demonstrated above that Plaintiff's other claims fail to state cognizable claims for relief, the derivative claim for declaratory relief also must be dismissed.").

Plaintiffs in this claim also request permanent injunctive relief.  In determining whether injunctive relief is appropriate, courts consider whether:

(1) the moving party has shown actual success on the merits; (2) the moving party will be irreparably injured by the denial of injunctive relief; (3) the granting of the permanent injunction will result in even greater harm to the defendant; and (4) the injunction would be in the public interest.

*Coffelt v. Fawkes*, 765 F.3d 197, 201 (3d Cir. 2014) (citing *Shields v. Zuccarini*, 254 F.3d 476, 482 (3d Cir. 2001)). For the reasons discussed above, Plaintiffs have failed to state any claim upon which relief can be granted. Their claim for injunctive relief thus falters on the element of showing success on the merits and will likewise be dismissed.

###   H.   Plaintiffs' Motion to Strike

This leaves Plaintiffs' motion to strike REA's motion to dismiss, which is contained in their brief in opposition to REA's motion to dismiss (ECF No. 35). Plaintiffs' sole argument in support of this motion is that REA has refused to produce its articles of incorporation and that this qualifies as bad-faith behavior. Notably, Plaintiffs cite no law or other authority in support of this motion.

Earlier in this case, Plaintiffs filed a motion to compel REA to produce its articles of incorporation. (*See* ECF No. 27.) REA responded—correctly—that Plaintiffs' discovery requests were premature under Rule 26(d)(1) because the parties had not yet conferred as required by Rule 26(f). Rule 26(d)(1) provides that, unless an exception applies, "[a] party may not seek discovery from any source before the parties have conferred as required by Rule 26(f)." Thus, because the parties had not yet conferred pursuant to Rule 26(f), the Court denied Plaintiffs' motion to compel as premature and scheduled a Rule 16(b) initial case-management conference.

Puzzlingly, Plaintiffs then (jointly with REA) moved to stay the initial-scheduling conference as well as all discovery and deadlines—including Rule 26 deadlines. Plaintiffs thus agreed to put on hold their own right to discovery; had they not sought this stay, the parties would have been required to hold their Rule 26(f) conference and Plaintiffs would have been entitled to engage in discovery and would likely have been entitled to discover REA's articles of

incorporation.  Yet notwithstanding their own request to stay discovery, Plaintiffs now complain that REA will not produce a document it is not currently required to produce and request that the Court strike REA's motion to dismiss on that basis.  The Court declines to do so.  REA has no obligation to produce its articles of incorporation and Plaintiffs have stated no legal authority for their motion to strike.  Moreover, Plaintiffs' predicament is one of their own making.  Plaintiffs' motion to strike will thus be denied.

## I.    Leave to Amend

As a final matter, Plaintiffs have requested leave to amend their complaint if the Court grants REA's motion to dismiss, which it will.[15]  Generally, courts should give a plaintiff the opportunity to amend his complaint unless amendment would be inequitable or futile.  *Phillips*, 515 F.3d at 236 (citation omitted).  Amendment is futile "if the amended complaint would not survive a motion to dismiss for failure to state a claim upon which relief could be granted." *Alvin v. Suzuki*, 227 F. 3d 107, 121 (3d Cir. 2000); *see also Centifanti v. Nix*, 865 F. 2d 1422, 1431 (3d Cir. 1989) (district court may "properly deny leave to amend where the amendment would not withstand a motion to dismiss.")

For the most part the Court discerns no way in which Plaintiffs could plead viable versions of the claims they asserted in their complaint.  Plaintiffs' claims for breach of fiduciary duty and unjust enrichment appear irreparable; these claims are firmly based on matters addressed by contract and no conceivable amendments get Plaintiffs past that hurdle.  As for Plaintiffs' claim for breach of covenant of good faith and fair dealing, the Court has explained

---

[15] The Court notes that the Third Circuit has held that such cursory requests—made at the conclusion of a brief in opposition to a motion to dismiss—fall short of properly raising a motion for leave to amend. *Ramsgate Court Townhome Ass'n v. W. Chester Borough*, 313 F.3d 157, 161 (3d Cir. 2002).  The Court will nevertheless exercise its discretion and address Plaintiffs' request.

that this claim is subsumed in any breach-of-contract claim. Leave to amend those three claims is thus denied because amendment would be futile.

Plaintiffs' claim under the UTPCPL falters primarily on the element of justifiable reliance, but it is conceivable that they could allege that they took some sort of detrimental activity based on the October 2011 *Penn Lines* issue. The Court will therefore allow them to amend their UTPCPL claim.

Whether Plaintiffs should be permitted to amend their breach-of-contract claim is less straightforward. As explained, Plaintiffs have no cognizable breach-of-contract claim on the basis of REA's bylaws or Pennsylvania statutory law. But, although unlikely, it is possible that REA's articles of incorporation—which are allegedly also part of the contract between Plaintiffs and REA—contain a basis for Plaintiffs' breach-of-contract claim. And as noted in footnote 10 above, Plaintiffs can obtain those articles from the Pennsylvania Department of State. The Court will thus grant Plaintiffs leave to amend their breach-of-contract claim.

## IV. Conclusion

REA's motion to dismiss (ECF No. 10) will be granted and Plaintiffs' motion to strike (ECF No. 35) will be denied. Plaintiffs will not be allowed to amend their claims for breach of fiduciary duty, unjust enrichment, and breach of the covenant of good faith and fair dealing. Plaintiffs will, however, be allowed to amend their claim under the UTPCPL and their breach-of-contract claim.

A corresponding order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LEONARD CESSNA,** *on behalf of himself* | ) | **Case No. 3:16-cv-42** |
| *and all others similarly situated,* **and** | ) | |
| **GEORGE WORK,** *on behalf of himself and* | ) | **JUDGE KIM R. GIBSON** |
| *all others similarly situated,* | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **REA ENERGY COOPERATIVE, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

**NOW**, this 27th day of June 2017, upon consideration of REA's motion to dismiss (ECF No. 10) and Plaintiffs' motion to strike (ECF No. 35), and for the reasons set forth in the memorandum opinion accompanying this order, it is **HEREBY ORDERED as follows**:

1. REA's motion to dismiss is **GRANTED**.

2. Plaintiffs' motion to strike (ECF No. 35) is **DENIED**.

3. Plaintiffs are granted leave to amend their complaint with respect to their claim under Pennsylvania's Unfair Trade Practices and Consumer Protection Law and their breach-of-contract claim. Should they choose to do so, Plaintiffs shall file their amended complaint **on or before July 12, 2017**.

4. If Plaintiffs opt not to amend by that date, the Clerk shall mark this matter closed.

**BY THE COURT:**

**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**